All right, our next case is Thompson and Flowers versus Over The Line, numbers 23-3110 and 23-3111. And we'll hear from the appellant first. Good morning. Good morning. Good morning. Excuse me, for the record, my name is Joe Holt. I represent Christine Thompson and Christian Flowers. The appellant's in this consolidated appeal and I would respectfully request that I explain the story about it. That'll be granted. In this consolidated appeals, there's really two issues. The first issue applies to both of the parties. Second issue would be moot if I don't want to go on the first issue. The first issue deals with the court's summary judgment of ruling on the waivers, finding that the waivers were effective and that the waivers released the negligence claims in this case. The court's ruling is summarized in three very short paragraphs on page seven of the joint appendix containing no citations whatsoever. It basically says that there's no dispute that the plaintiff had an opportunity to read the waiver, but chose not to do so. And we- Can I just ask you, we're not, you're not making an argument that the waivers were unclear if we were to go to that. Yeah, turn them over, grab them, correct. Okay, great.  But to have an opportunity, you have to know they exist. And as presented, we take the position that they had no opportunity. We do believe that a jury might be able to find that. I mean, in this record, the captain said he explained it to them. They said he didn't, but those are factual issues for the jury to resolve, not the court. Likewise, he said there's no dispute that they had an opportunity to ask questions, but if you don't know that there's something there, then you're not gonna know what questions to ask. So once again, we think that's a factual ruling and dispute that maybe the jurors would accept that the courts should not find as a matter of law. And then finally, he said that there's no dispute that the plaintiffs had an opportunity to remove the clip at the top, and that would reveal the language generally least contained language. But there's no obligation when someone hands you a clipboard to remove the clip to see what else is at the top. Clearly, they thought that there was no such language because the signature lines were- Well, what did they think they were doing when they were given a clipboard and asked to sign? There were two answers to that question. One answer was they thought that they just wanted a list of who's on board and their contact information, which makes sense. For what purpose? Well, if you have an accident, see, or something like that. If you have what? If you have an accident, somebody falls overboard or something of that nature, you'd like to know who's on the boat. The second one is they thought that they wanted it for promotional purposes in order to send them literature later on, which in fact has happened, to see if they wanna come back again. So they thought it was for informational purposes. They certainly didn't think it was for the important purpose of the release. And they testified to that and no one else testified to the contrary. And by the way, there's not one, there's six statements. And three of those statements are college kids. And for me, because the family went there, they're all there at the same time, their testimony is consistent, it has credibility. Again, a jury could reject that, I understand that. But we respectfully submit that those are the issues for the jury, not the court. Without a summary judgment.  Again, of course, we're aware there's some judge standards, all the emphases, and if this is a plaintiff. So you seem to be arguing that there's some sort of excusable ignorance or fraud in the execution of whatever this waiver was, right? No, I think the captain didn't do his job. I think the captain handed him a clipboard, told him to sign it, went on and started getting the boat ready, not making them understand what this was. And I think they- I'm saying on your part, your argument would be then there's some sort of excusable negligence about signing a waiver, right? Or fraud in the execution of this waiver. Because your clients didn't know what it was. It's a softball. I guess, I guess that'd be it. All right, okay. And so, I mean, to me, you will often tell me, but I think the issue is crystal clear. I don't think any argument that I can make one way or the other adds to it, except for two things. And one is, they explained carefully that that clip covered that paper. And while we have pictures of the release of the boat that the captain took, we now know that that release was not the first thing he took a picture of. So he obviously, he moved the papers around. And when Judge Malloy made his ruling, he did not find that language was visible. To the contrary, he found that they had the opportunity to remove the clip. So, Mr. Holt, we're dealing with admiralty law here, right? Yes. As opposed, is our jurisdiction and the jurisdiction of the district court based on 1333 as opposed to diversity? Well, jurisdiction is invoked in both. I mean, this is both a diversity and an admiralty jurisdiction case. Generally speaking, the pieces of this nature are construed under admiralty law. As a matter of fact, I mean, we mentioned it. Okay, if you agree, the admiralty law applies to the construing of the release. Is there any admiralty law that we should be looking at as to the responsibilities of the appellee in discussing any liability for one who gets on a commercial carrier like this? I don't know if I have an answer to that. I mean, certainly the law requires a release to be clear and unequivocal, and that would be on the burden of the party asserting the protection. I do mention in our brief that the Supreme Court of the United States found that such waiver language in admiralty is just void per se. The four circuits that have addressed it since then, three have disagreed with the Supreme Court. The fifth circuit still maintains it. I didn't feel like raising it to this level in this case, but I felt like it was clear it was a question I found. We haven't spoken on it. I couldn't find anywhere where you have spoken on it. That's the Bissell case? Yes, and clearly there's a whole floor of cases since Bissell which suggest that the courts would not follow it in a setting like this, but it's still a record and still something that maybe should be addressed, but that's the policy issue, and that's based on that. I'm only mentioning it because you raised the issue of admiralty, and that's where it came under. I wanna just briefly get to my second point because the second point really would be if the case is remanded, we would ask that the court direct the district court judge to conduct a full analysis on the exclusion of Dr. Steinberg. Can I ask you a question on that? I was looking over the record, and there's a final pretrial order in this case, and the doctor is listed as a lay witness, not as an expert witness, but at the bottom, by your signature and the district court signature, it said amendments can only be made for manifest injustice. This isn't a different point in the trial, in the litigation. Now we already have a final pretrial order. Shouldn't we be respecting that and the standards set forth in there, manifest injustice? Isn't that, rather than rule 37, the standard we ought to be looking at to decide whether something can be changed to flip the doctor from the lay witness list to the expert witness list? Yeah, but you'd be giving a little form over substance because the joint final pretrial order also says all motions that eliminate were to be filed quite some before the date that it was filed, and in this particular case, I don't think the court had any difficulty in addressing the motion out of time, it did so, but I do understand the point you're making, and our local court system, I mean, causation is not necessarily an expert thing. Clearly, in a toxic tort, it is. A broken arm, it's not. This is somewhere in between. There's an injury, and then there's a question about whether or not it's an aggravation, so it's not, it's just straightforward causation issue. You do wanna treat the doctor as an expert, though, right? Yes. Okay. For the causation issue. Yes, and in this particular case, I mean, none of you have his records, their parents have cross-examined him, their own doctor had found that causation, but for me, part of the problem is that we faced, and that the doctor would not, under his hospital policy, would not meet with us or talk with us, and therefore, it's impossible to actually submit an expert report if you can't talk to the expert. I know everything I'm saying. We couldn't even prepare for it. When I asked him those questions at the deposition, I had no idea what he was gonna say. I had an idea what my clients said he was gonna say based upon conversations they'd had between the two, but I had no idea. I thought the whole thing was interesting with that, about your lack of access. So I guess that doctors at Northwestern can't act as experts in cases? Apparently not, and I'm gonna tell you, I ran into the same problem in the Mayo Clinic in Florida, and I ran into the same problem in another case with my approaching counselor at a hospital in Texas, where they can't talk to us in advance, they can't write a report, we can't even, they can be deposed, but you don't get to meet them. You can't separately retain them as experts in litigation? No, they have hospital policies that prohibit them from writing reports or be separately retained. Okay. You know what, I think it's becoming more and more common. In this case, probably I should have flown Kristen Flowers to Virgin Islands, had her seen by a doctor and done that. In this particular case, I had co-counsel Ryan Green, Kristen Flowers was the one he handled. He drowned in October of 2022, and I ended up taking on the load. That's not an excuse, but it's just an explanation in trying to explain how all this came about, because we pride ourselves on meeting these deadlines and complying with these sentences. So did you represent both Thompson and Flowers below? I represented both of them. Below, okay. But Kristen Flowers' case was filed first. Right. And then, excuse me, Kristen Thompson's was filed first, and Kristen Flowers contacted Ryan. When he decided to bring her on, my name was on the complaint, so I'm not gonna pull off of that. Okay, no, I just, all right. I mean, there was a time when I was thinking about getting out of this case altogether, but we're- Okay, let me ask you a question about what's remaining. I know we're talking here about the Dr. Stanky. The Thompson case went to the jury on gross negligence, correct? Correct. Did you appeal that? No. Whereas the Flowers case did not go to the jury, because there was no expert.  So if we agree with you on the first part of your claim on, first part of your case on a waiver, is Flowers gonna be able to also have her gross negligence claim submitted to the jury? If I give out negligence claim, I'm not gonna argue gross negligence. You're not gonna argue gross negligence. It's a very tough stand. I mean, raising construction. All right. As a matter of fact, I mean, one of the things that happened was, after everything was over, before the judge was in there, Judge McCoy asked me if I wanted to disconsent to only admiralty jurisdiction, in which case he would enter findings. But I realized if I could get this case reversed on appeal on the waiver, the last thing I want is Judge McCoy deciding as a fact finder whether or not they knew something. And so, and that's why we didn't do that. So, we keep the claim, but we learned our lesson about gross negligence. All right. Thank you, Counselor. I'm here on rebuttal. And I'm here for your answer. Good morning, Your Honor. Good morning. I'm Steve Dunsing here for both Applebee's over the line and Captain Malthan. On the first issue, we believe it was totally appropriate for Judge Malloy to grant summary judgment on the ordinary negligence claim because of the release waiver. And it- Can you help us understand how there's not a material dispute about- Absolutely. Because the plaintiff's, then plaintiff's subjective belief about whether it is a release or not, or simply a sign-in sheet, does not create a genuine issue of material fact. The undisputed fact is they just didn't read it. They had a very clear opportunity to read it, and they had a very clear opportunity to ask questions about it. They didn't ask anything about it. But isn't this case fundamentally different than those that you're relying on? I mean, the cases that you point us to, the facts of them are, there is a release, and then there's a signature at the bottom of the page. You know that they're words. If you don't read them, or you don't understand them, that's fundamentally different than, you have a page that has a list on the back. There are three lines on it. One says signature, one says, I think, address or something, and the other phone number. If we accept, as I understand, we must, the reasonable factual allegations in favor of the non-moving party, the clip covers the top of the page, it says general release. What do we do with that? Well, I would respectfully disagree about the one-page versus two-page argument. I argue the very same issue where plaintiff's attorneys have said, when it's on one page, that the print is too small. In this situation, as counsel just conceded, there's no argument about the actual language. Language was normal-sized print. It was bold. The second page, which did have the lines, as Your Honor recognizes, for not only signature, but also name and address, had in bold print at the top, release continued. I agree. I understand that, but my point is, isn't there a dispute about that being, well, there is uniform testimony from the passengers on the boat that that was covered. Correct, but it was also undisputed that the captain didn't rush them out to sea, and believe me, I defend a lot of admin cases, and we try to teach our captains how to handle this. Captains didn't rush them out to sea and then give them a release. I had another case where they literally dropped the woman into the ocean before they could get her on the boat, where they have them sign release. Okay, this captain came ashore. Everyone was seated at a picnic table. Both plaintiffs are college-educated professional women. One is a nurse who testified in deposition that she handled releases and informed consents all the time. The other one is an executive with a medical equipment company. They weren't rushed. No one claimed that they were rushed. They sat for something like half an hour at this picnic table passing this around, and Judge Malloy rightfully found- Whoa, whoa, whoa, hold on now. There's one other fact. What about the testimony that the captain said, hey, we just are looking for passenger information? Well, that maybe would be a factual dispute because the captain testified otherwise, but the fact of the matter is they have the document in front of them. They all said they didn't read it. Had they read it and then been confused about the meaning of the words or whether it was a sign-in sheet? Well, Judge, what Cumbria-Reed said is there's three lines, signature address and printed name or whatever. Yeah, it's not rocket science. It's where the captain's saying we just need to know who you are type thing. I mean, are they, were they really induced? And how they've known that this is something more than just contact information. I don't believe there's any, and it has to be a genuine issue. I don't believe there's any genuine issue that they were induced into signing a document. They came, they sat down, the captain gave the clipboard, and this is a very common procedure down here to put the document on a clipboard, although more companies do it online by electronic signature now. I think this is a more common practice, but they had the document and Judge Malloy said, if you read it, you'll know what it is. They just didn't read it. There was no confusion because they didn't read it. They were presented this clipboard with their testimony, had the clip covering the words, general release on the page that had the lines on it. There was nothing to read. They signed, they signed on that page. With all due respect, there was the entire document to read, very large print, bold, bold. On the other side. On the other side. No, the signature page is actually the back of the document. But they were handed this clipboard outside. Likely there were some elements outside that required the clipboard, kept the paper down. But the clip on the clipboard covered up, in their testimony, the language, general release. But Your Honor, that's not a permanent feature. You're handed a clipboard, you read it. If you read it, you can manipulate it. But they said they were told that there was something that they needed to read that involved a general release. They didn't read it. Yes, but they didn't read it because they weren't, their testimony is, they weren't told there was something there to read. So they're gonna just sign a document without reading it, without having any- Because they were told they wanted the information about who was on board. Well, Your Honor- As strange as that may seem, that's their testimony. I understand, but we've cited a whole line of cases that say the failure to read the document does not create the genuine issue of material fact. And there was no dispute that they were educated and had the ability to read and worked with releases in their jobs. No dispute that they had an opportunity to read. That's the real focus. Did they have an opportunity to read? I've had cases literally where people are taken out to sea and then given a release. And I would agree with Your Honor, in that situation, what are you gonna do? Tell the captain to turn around and take you back? But that's why they have an entire procedure where they sit with these people. They have a picnic table, excuse me. They have a picnic table right there at the dock where the people sit. The captain presents the document for them. He's available to ask questions. They didn't ask any questions. They didn't say, what is this? Why am I signing this? I don't want to sign a release. And to counsel- So a jury conceivably, if there was a jury, and I guess this is some, let's say a question you should answer for us, but assuming that there's a fact finder, there's a fact finder. A fact finder can agree with you and say that they had an opportunity and they should have read that document. But the question here is whether or not some re-judgment should have been granted when there's a genuine issue of material fact. We don't agree that that was a genuine issue. We agree that we believe that the key factors that Judge Molloy considered were they had the ability to read, they're mature, they're educated, they're not little kids. They had an opportunity to read. They were not rushed. No one said that they were rushed. They had a captain available to ask questions if they had- Don't you have to know that there is something to read? If somebody hands you a piece of paper and says, I need your contact information. There's nothing on that. If we accept their facts as true, the portion that says general liability, well, that's covered. How do you know there's something to read? The defendant has to be able to rely upon the fact that these people signed this. And if these people sign a document without reading it, then why should my client be penalized for that? It was undisputed that they had an opportunity to read. It was undisputed that they did sign. And they did more than sign. They signed, they provided their name, they provided their address. No one says they were rushed. No one says they were pressured into signing. And bear in mind, this is unlike the Bisto case. This is a voluntary recreational activity. I could see, for example, we were talking about the commercial ferry between St. John and St. Thomas, and you were making people sign a release when they're getting aboard some kind of a common carrier, where the Bisto case was a towboat that was dragging a dumb barge up the Mississippi River. These are not voluntary recreational activities. So it's understandable why a release perhaps would not be enforced in that kind of a situation. But here there's probably 50 different charter boat companies, if not more, in the Virgin Islands. If somebody signs you, it hands you a document, and you read the document, and you say, well, I don't want to sign a release, then you go to another company. But they didn't read it, and my client shouldn't be generalized. I would understand if- And your document also contained assumption of risk language, did it not? It did, but it was primarily directed to a waiver of negligence claims and a statement that the ocean is an inherently dangerous, a dangerous area. My experience is an admiralty assumption of risk still lives. Virgin Islands law, they eliminated it because it was my case that I won, and they took it away from us. Admiralty law, until somebody tells me otherwise, I believe assumption of risk is still a viable defense. You're over time now, but I do want to ask you one thing regarding the expert, or Dr. Steinicke. And I want to ask quickly, did you suffer any unfair surprise or prejudice from the failure to designate him as an expert? I mean, you did have him at a video depth. You did cross-examine him. That's really, with all due respect, not the right question to be addressing, but let me just make three real fast points. First point, counsel and I both agree that if we went on the first issue, there's no liability, so you don't even get the damages. Second point that nobody's talking about is, Dr. Malloy didn't bar, I mean, Judge Malloy didn't bar the doctor from testifying. In fact, he stopped the trial, allowed counsel to try- Well, he was listed as a witness, right? But the fact is, they need him for causation, right? He could have called him live. He could have called him by video. He simply said, you can't, he didn't say you can't use this witness. He said, you can't use this deposition transcript because there's no foundation for his opinion in the transcript. Call him live. Call the doctor who actually treated him, Dr. Heim. Call Dr. Fernandez, who's right there in Puerto Rico within the subpoena power of the court. Call some other doctor live, and Judge Malloy even halted the trial to allow counsel to try to call this doctor to see if they could get him on a video link to testify live, so that the witness wasn't barred. It was just the deposition transcript. As to your question, there was no need, and we didn't really make it, we didn't really argue about whether he was a disclosed expert under Rule 26 or whether he was a treating physician expert. The question was, the point was, there was no foundation for his opinion on causation because he didn't treat this woman. And basically, he said in his deposition, I said, well, did you review the records from Dr. Heim, who actually did treat her? He said, yeah, I'm reading them right now for the first time during my deposition. And what Judge Malloy said is, the doctor is simply parroting back what he's reading in the record from Dr. Heim, who actually did the treatment. It wasn't his own opinion, so there was no foundation for him to talk about causation or prognosis. But the key thing is, the doctor wasn't barred from testifying. They could have brought him or any other doctor in. It was just the deposition transcript that was kept out of the case. Okay, thank you, counsel. Thank you. I'll be brief. So I think you understand the first issue. You know, a long time ago, when I used to sue the government, I learned when you sue the government, you gotta cut square corners. I think the same should apply to this type of release. They have to be clear and unequivocal if you want that much protection. But on Dr. Stein, I was supposed to counsel on that. I'm amazing enough to read on so much throughout this trial that there are very few objections and there are very few arguments. But I do disagree with that last statement he made that the judge only excluded the deposition. The judge, and it's in the joint appendix 11 to 15 on page 15, he basically said, so it wasn't with the doctor's testimony. Page, joint appendix 11 to 15 is when he put this findings on the record. And he said, I'm not gonna let a doctor read someone or other doctor's records and render opinion. So we did not have that opportunity to simply call. Now we did try to subpoena him, which is pretty hard to do in the middle of a trial when he's in Chicago and doesn't want to be subpoenaed. But that being said, I respectfully disagree with my brother here that I had the opportunity. We did not. The judge excluded him because he said he can't testify based upon records of other doctors, which under rule 703- I'm sorry, is your argument then he, the Judge Malloy said you can't show the video, you can't read the testimony in. And you're saying just as a matter of course, you couldn't subpoena him, so therefore you were barred. I subpoenaed him and he testified under Judge Malloy's ruling. He's still willing to render that opinion. He said, I'm not gonna let him read other records, which under rule 703, of course you can do. And so I think that you understand all the issues and I'll return my time to the court unless you have other questions to ask. One simple question, I'm just not sure the answer to this. If we agree with you on the waiver question and this goes back, are you in diversity or are you in that one? We're still in both. I mean- You said you'd still argue for a jury trial. Which is not where I'm going in my comments about how that has- There's still time. So yes, we're still under diversity. Thank you. Okay, thank you, counsel. We will take this case under advisement.